**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kenneth Long, et al., | No. CV09-2209 PHX DGC |
| Plaintiffs, | **ORDER** |
| vs. | |
| TRW Vehicle Safety Systems Incorporated, | |
| Defendant. | |

TRW has filed motions to exclude the testimony of Plaintiffs' experts Hassan El-Sabeh and Paul Lewis. Doc. 118. The motions are fully briefed. Docs. 144, 146, 156, 158. The parties agreed at the hearing on October 12, 2011, that further oral argument is not required. For reasons that follow, the motion will be denied with some instructions.

**I.    Hassan El-Sabeh.**

   **A.    Alleged Inadequate Disclosures.**

TRW asks the Court to preclude Mr. El-Sabeh from testifying at trial because his expert opinions were not fully disclosed until his rebuttal report was filed on October 8, 2011. Specifically, TRW argues that Mr. El-Sabeh failed to identify the specific defect in Ms. Johnson's seatbelt buckle and the specific defect in Sean McKnight's seatbelt when his initial disclosure was made on August 13, 2010.

Mr. El-Sabeh produced three expert reports before the August 13, 2011 deadline. His report dated December 4, 2008, specifically identified the following defect in Ms. Johnson's seatbelt buckle:

> After latch plate insertion into the buckle assembly, the red seatbelt buckle release button stays in a "slightly depressed" position (DSC02469-77) indicating "the buckle is only partially latched." *See* NHTSA Campaign ID Number 01V227001). Testing of this buckle in a partially depressed position reveals various loads ranging from 18.8 lbs. – 32.1 lbs. which will unlatch the seatbelt buckle. Also, photographs of Mrs. Cynthia Johnson at the scene shows what appears to be an abrasion across the abdominal area (DPS IMG_0454-455) consistent with seatbelt use during this accident.

Doc. 120-5 at 44. In the same report, Mr. El-Sabeh identified the alleged defect in Sean McKnight's seatbelt: "The available lap and shoulder seatbelt for Sean McKnight spooled out." Doc. 120-5 at 45. The Court concludes that these statements by Mr. El-Sabeh, although somewhat cryptic, identified the opinions he proposes to give at trial. This is particularly true given the detailed deposition TRW chose to take of Mr. El-Sabeh.[1]

Rule 37(c)(1) provides that the Court may not preclude an expert witness from testifying at trial if his inadequate disclosure was substantially justified or was harmless. It is clear that a substantial amount of relevant discovery was produced by TRW after Mr. El-Sabeh's August 13, 2010 expert report. Without assigning blame for the timing of these disclosures, the Court finds some justification for the additional detail contained in his rebuttal report of October 8, 2011. What is more, TRW has not shown that it has been prejudiced by Mr. El-Sabeh's inadequate disclosures before August 13, 2010. Additional detail and support of his opinions was provided in his report of October 8, 2011, and in his detailed deposition. TRW does not explain how it would be prejudiced if Mr. El-Sabeh is permitted to provide the same information during his testimony. Exclusion of Mr. El-Sabeh's opinions therefore is not warranted under Rule 37(c)(1).

---

[1] Lawyers are not obligated to conduct detailed depositions of experts. If they choose to do so, Rule 26(e)(2) suggests that the deposition testimony constitutes part of the expert's disclosure in the case. Indeed, the rule requires that the deposition-stated disclosures must be supplemented if new information is discovered. Many lawyers, wishing to limit experts to the opinions stated in their reports, will not engage in a detailed cross-examination at the deposition. When lawyers choose to conduct such a cross-examination, however, they generally must live with the disclosures made in the deposition.

**B.     El-Sabeh's Qualifications.**

TRW argues that Mr. El-Sabeh is not qualified to provide opinions on seatbelt failures. TRW notes that he is not a licensed engineer, has never designed a seatbelt assembly, has never published scholarly works about seatbelts, and holds no patents for seatbelts. Doc. 118 at 6-7.

As Plaintiffs note, however, Mr. El-Sabeh has been an automotive safety engineer for 27 years. He is a member of the Society of Automotive Engineers and the Association for the Advancement of Automotive Medicine. He received bachelor of science and master of science degrees in mechanical engineering from Wayne State University. His studies included working for the U.S. government to develop computer modeling of safety restraint harnesses for the Air Force. Mr. El-Sabeh began working for General Motors in 1983 as a product engineer for safety and crashworthiness, which involved investigating, testing, evaluating, and validating seatbelt designs. Mr. El-Sabeh became the lead safety and crashworthiness engineer for all GM truck and coach programs in the engineering of rear lap and safety belts, and later became senior project engineer for safety and crashworthiness. Mr. El-Sabeh also served as General Motors' senior consultant and manager for product liability, during which he assisted in product litigation matters, including preparing technical defenses.

The Court concludes that Mr. El-Sabeh possesses sufficient scientific, technical, or other specialized knowledge to testify as an expert on seatbelt design under Rule 702.

**C.     Reliability of Mr. El-Sabeh's Buckle Testimony.**

TRW asks the Court to preclude Mr. El-Sabeh from testifying about design defects in Ms. Johnson's seatbelt buckle. TRW argues, with some persuasive force, that Mr. El-Sabeh failed to identify any specific defect in his first three expert reports, did not attempt to identify a specific defect until his rebuttal report, and relied heavily on a recall of an earlier version of a TRW seatbelt buckle that has not been shown to be substantially similar to Ms. Johnson's buckle. TRW notes that El-Sabeh cannot recall how he manipulated the buckle when he achieved the "partial engagement" to which he testified,

that he agreed that partial engagement was mimicked for purpose of the x-ray analysis, and that he is unable to articulate any remedy for the purported design defect.

The Court has reviewed Mr. El-Sabeh's expert reports and substantial portions of his deposition. Mr. El-Sabeh's report of October 8, 2010, provides the following description of the design defect he has found in the TRW buckle used by Ms. Johnson:

> My observations are that partial engagement exists in the buckle due to the defect between the push button and the buckle base, ejector spring and lever, and a defect in the latch guide and sensor mass and/or due to a defect in the latch spring. The documented and photographed full engagement of the depressed push button position of the examined seatbelt buckle is shown on (DSC00820, DSC00828) while a partial engagement of the depressed push button position is shown on (DSC00821, DSC00830). . . . [The partial engagement is reflected in] my own inspection photographs taken on September 24, 2008. All of these reflect that the ejector spring did not serve to "kick out" the tongue that is not fully engaged and that the seatbelt failed FMVSS 209 S4.4(b)(3): "[T]he structural components in the assembly that are common to pelvic and upper torso restraints shall withstand a force of not less than 13,345 N." (3000 lbs).
>
> Given this evidence, to a reasonable scientific probability, the subject front passenger seatbelt buckle that suffers from a witnessed and documented partial engagement defect also suffered from that defect on June 19, 2005, the date of this vehicle rollover, and that defect allowed the buckle to appear engaged, but to release during the rollover, allowing Cynthia Johnson to be ejected from the vehicle.

Doc. 120-3 at 65.

During his deposition testimony, Mr. El-Sabeh conceded that the partial engagement was artificially created during x-ray analysis of the buckle in 2010. Mr. El-Sabeh did not state, however, that the condition was artificially created during his examination in 2008. Rather, he testified that in 2008 he inserted the buckle and observed the partial engagement. He stated that he did not "cycle" the buckle, inserting the tongue repeated times, because he did not want to alter the existing evidence. Mr. El-Sabeh stated that he did not learn that the partial engagement could be artificially

mimicked until 2010. As a result, TRW has not shown that Mr. El-Sabeh artificially created the partial engagement that he observed in 2008.

TRW has not provided a sufficient basis to grant its motion. Plaintiffs present the testimony of an engineer with more than 20 years' experience in automotive seatbelts, who observed a partial engagement in Ms. Johnson's seatbelt, photographed it, and – it appears – did not artificially create it. Mr. El-Sabeh has provided an explanation for the partial engagement. The Court cannot conclude that this evidence is so inherently unreliable that it should be excluded from trial. "In serving its gatekeeping function, the court must be careful not to cross over into the role of fact-finder. It is not the job of the court to insure that the evidence heard by the jury is error-free, but to insure that it is not wholly unreliable." *Southwire Co. v. JPMorgan Chase & Co.*, 528 F. Supp. 2d 908, 928 (W.D. Wis. 2007). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993).

### D.   El-Sabeh's Spool-Out Opinion.

TRW asks the Court to preclude Mr. El-Sabeh from opining that the seatbelt in the third row where Sean McKnight was seated "spooled out" during the rollover, permitting Sean to be ejected from the vehicle. TRW asserts that Mr. El-Sabeh's opinion is "scatter shot," "vague," and unsupported by testing. Mr. El-Sabeh summarized his opinion:

> As I pointed out earlier, the belt length, webbing elongation, anchorage locations, film spooling, and webbing transfer through the latch plate compromise the effectiveness of the available seatbelt system. The consequences of the poor belt performance would have been minimized by optimizing webbing elongation and length, the use of all belts to seats (integrated seatbelts), a synch-type or adjustable locking latch plate, a web grabber, and/or a pretensioner. Each of these devices has been demonstrated to reduce occupant excursion in collisions and rollovers. . . . [I]t is my opinion that Defendant did not provide any alternative safety features designed to reduce or eliminate the harms and risks associated with the use of the lap and shoulder safety belt in foreseeable rollover accidents. It is my opinion that the subject seatbelt systems were defective.

Doc. 148-3 at 7.

During his deposition, Mr. El-Sabeh provided substantial additional explanation. Doc. 148-7 at 72-87. Mr. El-Sabeh testified about a surrogate test to determine the amount of excess webbing released by the seatbelt during the rollover. He described the marks on the seatbelt that permitted him to determine the amount of the seatbelt that spooled out, and identified the location from which the releases occurred. Given his years of experience in seatbelt safety, the Court cannot conclude that his methods were so unreliable as to be inadmissible at trial. As noted above, thorough cross-examination, contrary expert testimony, and careful instructions on the burden of proof are the best means for testing the reliability of such expert evidence at trial.

## II. Paul Lewis.

### A. Opinions Beyond Mr. Lewis's Expertise.

TRW argues that Mr. Lewis, an expert in biomedicine, biomechanics, and occupant kinematics, is also being asked by Plaintiffs to render opinions on seatbelt design and accident reconstruction. Doc. 119 at 5. TRW argues that Mr. Lewis has no expertise in these areas.

In response, Plaintiffs state that they will offer opinions from Mr. Lewis that "deal exclusively with issues of biomechanics, injury causation, and seatbelt performance." Doc. 146 at 6. They assert that Mr. Lewis will make no attempt to reconstruct the accident. *Id*. at 6. They also assert that his testimony about alternate seatbelt designs "is simply Mr. Lewis's observation that a different sort of seatbelt has 'better geometry' and affords 'better coverage' for a small child than the seatbelt Sean was using at the time of the accident." *Id*. at 7. Plaintiffs state that Mr. Lewis "offers a conclusion that only concerns the adequacy of the containment or restraint afforded by the alternate seatbelt without any evaluation of its engineering." *Id*.

Mr. Lewis is a biomedical engineer with expertise in biomedical/biomechanical engineering related to injury causation and prevention and occupant kinematics. Doc. 120-5 at 89. He has a master's degree in biomedical engineering from the

University of Alabama Birmingham and a bachelor's degree in industrial engineering from the University of Alabama. *Id.* He worked for two years as an intern at the Office of the Medical Examiner in Atlanta, Georgia, and then began working at his current consulting firm. He has been involved in the investigation of more than 2,000 vehicle accidents. *Id.*

It appears to the Court that Plaintiffs are not presenting Mr. Lewis as an expert on accident reconstruction. Doc. 146 at 6. This appears to be a well-founded limitation, as Mr. Lewis identifies no expertise in his report that would permit him to reconstruct accidents. Plaintiffs do suggest that Mr. Lewis will be asked to offer an "observation" on better seatbelt geometry and better seatbelt coverage. Doc. 146 at 7. Mr. Lewis's qualifications for such opinions are not apparent in his expert report and are not identified in Plaintiffs' response. Thus, the Court is doubtful that Mr. Lewis is qualified to offer seatbelt design opinions.

Because TRW's motion and Plaintiffs' response does not identify specific testimony that might be given at trial, the Court cannot enter a precise ruling. The Court does conclude, however, that Mr. Lewis will not be permitted to offer accident reconstruction testimony. The Court is also skeptical that he should be permitted to offer seatbelt design testimony. The Court will rule on specific objections at trial.

**B.     Mr. Lewis is a Rebuttal Expert.**

TRW notes that Mr. Lewis was not disclosed as an initial expert by Plaintiffs. Rather, he was first disclosed in October of 2010 as a rebuttal expert. TRW asks that the Court preclude Mr. Lewis from offering "affirmative opinions," and identifies a number of specific opinions from his report that should be excluded.

Plaintiffs state that Mr. Lewis will "testify in rebuttal in this matter." Doc. 146 at 2. Plaintiffs argue that many of the affirmative opinions identified by TRW directly contradict opinions of TRW's experts and therefore constitute appropriate rebuttal testimony. The Court's Case Management Order stated that "[r]ebuttal experts shall be limited to responding to opinions stated by initial experts." Doc. 28 at 2. The Court will

maintain this limitation at trial. Mr. Lewis may testify during Plaintiffs' rebuttal case. He may respond to opinions of TRW's experts within his realm of expertise and his expert disclosures. The Court cannot determine at this stage which of his opinions will be appropriate rebuttal testimony. That decision must be made at trial. If TRW believes that Mr. Lewis is venturing beyond rebuttal opinions or his own disclosures when he testifies during Plaintiffs' rebuttal case, it may object. The Court will rule on the objection at that time.[2]

**C.   Specific Opinions.**

TRW asks the Court to exclude several specific opinions of Paul Lewis, arguing that they are unfounded. TRW cites to specific statements in Mr. Lewis's deposition and assertions by its own experts to argue that particular aspects of Mr. Lewis's testimony should be excluded. Plaintiffs respond by citing other portions of Mr. Lewis's deposition testimony and reports. Both parties cite articles submitted in connection with the motion and response.

The Court cannot at this time reliably rule on the admissibility of particular sub-parts of Mr. Lewis's rebuttal testimony. The Court must first hear the testimony of TRW's experts and the foundation for particular aspects of Mr. Lewis's testimony. TRW may object to testimony it believes to be unfounded, and may even voir dire the witness where appropriate. The Court will be better equipped to rule on such issues at trial.

**IT IS ORDERED:**

1.   TRW's motion to exclude the testimony of Hassan El-Sabeh (Doc. 118) is **denied**.

2.   TRW'S motion to exclude the testimony of Paul Lewis (Doc. 119) is **denied**. Mr. Lewis will be permitted to testify as a rebuttal witness in areas of his

---

[2] The Court notes that Plaintiffs submitted declarations of Mr. El-Sabeh and Mr. Lewis in support of their responses to TRW's motions. These declarations appear to contain new explanations, and perhaps new opinions, from the experts. No new opinions set forth in the declarations will be permitted at trial. The experts on all sides will be limited to opinions expressed in their Rule 26 reports and depositions.

1  expertise.  The Court will rule on specific objections during trial.
2         Dated this 20th day of October, 2011.

_____
David G. Campbell
United States District Judge